UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DMCA Section 512(h) Subpoena to
YOUTUBE (GOOGLE, INC.)

Case No. 7:18-mc-00268 (NSR)

# MEMORANDUM OF LAW
# IN SUPPORT OF MOTION TO QUASH
# AND TO PROCEED ANONYMOUSLY

Dated:   Brooklyn, New York
         September 28, 2020

**FOSTER GARVEY P.C.**

By:  Malcolm Seymour (MS-3107)
100 Wall Street, 20th Floor
New York, New York 10005-3708
(212) 965-4533
malcolm.seymour@foster.com

*Attorneys for Movant John Doe*

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ i

INTRODUCTION ..........................................................................................................1

STATEMENT OF FACTS ..............................................................................................4

ARGUMENT ...................................................................................................................8

    I.     The Subpoena Should be Quashed Because Watchtower Cannot State a Valid
        Claim of Copyright Infringement ................................................................................8

      A.  The User Video Makes Fair Use of the JW Video and Is Not Infringement ..............11

          1.  *The User Video Makes Non-Commercial, Critical and Transformative Use
             of the JW Video* ....................................................................................12

          2.  *The JW Video is Informational and Non-Commercial in Nature* ..........................13

          3.  *The User Video Excerpts an Insubstantial Portion of the JW Video* ....................14

          4.  *The User Video Is Not a Replacement for the JW Video and Does Not
             Impact the Non-Commercial "Market" for the JW Video* ....................................15

      II.  The Subpoena Should Be Quashed Because Watchtower Has Misrepresented
         its Purpose ................................................................................................17

      III. If the Subpoena Is Not Quashed, Movant Should Be Permitted to Appear
          Anonymously in Future Proceedings ..........................................................................18

CONCLUSION.................................................................................................................21

# TABLE OF AUTHORITIES

*Page*

*Cases*

*Arista Records, LLC v. Doe 3* ...................................................................................9, 10, 11, 16
604 F.3d 110 (2d Cir. 2010)

*Art of Living Foundation v. Does 1-10* .........................................................................................11
Case No. 10-CV-5022 (LHK), 2011 WL 5444622 (N.D.Cal. Nov. 9, 2011)

*Authors Guild, Inc. v. HathiTrust* .................................................................................................14
755 F.3d 87 (2d Cir. 2014)

*Bill Graham Archives v. Dorling Kindersley Ltd.* ...............................................................13, 14
448 F.3d 605 (2d Cir. 2006)

*Blanch v. Koons* .....................................................................................................13, 15, 16
467 F.3d 244 (2d Cir. 2006)

*Brownmark Films, LLC v. Comedy Partners*..............................................................................10
682 F.3d 687 (7th Cir.2012)

*Campbell v. Acuff-Rose Music, Inc.*.................................................................................12, 14, 16
510 U.S. 569 (1994)

*Cariou v. Prince*.......................................................................................................................10, 15
714 F.3d 694 (2d Cir. 2013)

*Castle Rock Entertainment v. Carol Publishing Group, Inc.* .......................................................16
150 F.3d 132 (2d Cir. 1998)

*Doe v. Bedford Central School District, et al.*......................................................................19, 20
Case No. 18-CV-11797 (VB), 2019 WL 493819 (S.D.N.Y. Feb. 8, 2019)

*Harbus v. Manhattan Institute for Policy Research* .........................................................10, 14, 15
Case No. 19-CV-6124 (ER), 2020 WL 1990866 (S.D.N.Y. Apr. 27, 2020)

*Harper & Row Publishers, Inc. v. Nation Enters.* ......................................................................12
471 U.S. 539 (1985)

*Hosseinzadeh v. Klein*...................................................................................................................15
276 F.Supp.3d 34 (S.D.N.Y. 2017)

*Hughes v. Benjamin* ........................................................................................................10, 14, 15
437 F.Supp.3d 382 (S.D.N.Y. 2020)

*In re DMCA Subpoena to Reddit, Inc.* ...................................................................................11
441 F.Supp.3d 875 (N.D.Cal. 2020)

*Lenz v. Universal Music Group* ..........................................................................................10
815 F.3d 1145 (9th Cir. 2016)

*Malibu Media LLC v. Doe No. 4*.............................................................................18, 19, 21
Case No. 12-CV-2950 (JPO), 104 U.S.P.Q. 1941, 2012 WL 5987854 (S.D.N.Y. Nov. 30, 2012)

*McIntyre v. Ohio Elections Comm'n* ......................................................................................8
514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995)

*New York Times v. Sullivan* ....................................................................................................8
376 U.S. 254 (1964)

*NXIVM Corp. v. Ross Institute*..........................................................................12, 13, 14, 15, 16
364 F.3d 471 (2d Cir. 2004)

*Sealed Plaintiff v. Sealed Defendant*....................................................................................19
537 F.3d 185 (2d Cir. 2008)

*Signature Management Team, LLC v. Automattic, Inc.*........................................................18
941 F.Supp.2d 1145 (N.D. Cal. 2013)

*Sony Music Entertainment Inc. v. Does 1-40*........................................................................8, 9
326 F.Supp.2d 556 (S.D.N.Y. 2004)

*Talley v. California* ..................................................................................................................9
362 U.S. 60 (1960)

*U.S. v. Raniere* ......................................................................................................................12
Case No. 18-CR-204 (S-2) (NGG), Doc. No. 735 (E.D.N.Y. June 20, 2019)

*Yang v. Mic Network, Inc.*.............................................................................................10, 14, 15
405 F.Supp.3d 537 (S.D.N.Y. 2019)

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton* ...............................3, 8
536 U.S. 150 (2002)

### Court Documents

Petitioner's Br., *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*.........9
No. 00-1737 (U.S. Nov. 29, 2001)

***Rules, Statutes, Treatises, Misc., Etc.***

17 U.S.C. §§ 100, *et seq.*...........................................................................................1, 7

17 U.S.C. § 103(3) ...............................................................................................14

17 U.S.C. § 107...........................................................................................9, 10, 11

17 U.S.C. § 512(h) ...............................................................................................17

Fed. R. Civ. P. 10(a) .........................................................................................1, 18

Fed. R. Civ. P. 45(d)(3)...........................................................................................1

Fed. R. Civ. P. 45(d)(3)(A)(iii) ...............................................................................8

Howard B. Abrams, The Law of Copyright, § 15:52 (2006).........................................14

## <u>INTRODUCTION</u>

Movant John Doe respectfully submits this motion (the "Motion"), pursuant to Fed. R. Civ. P. 45(d)(3) and 10(a), to quash the subpoena (the "Subpoena") issued under caption of this action on June 20, 2018 or, in the alternative, for leave to proceed anonymously.

Movant is a lapsed Jehovah's Witness ("JW") who publishes satirical videos critical of JW on YouTube, a website that hosts user-created video content.[1]  Watch Tower Bible and Tract Society of Pennsylvania ("Watchtower"), is a tax-exempt organization that publishes JW instructional materials, and coordinates JW preaching and proselytizing efforts.[2]  Watchtower requested the disputed Subpoena to obtain Movant's name and identifying information under the pretext such information would be used "only for the purpose of protecting Watch Tower's rights under title 17 U.S.C. §§ 100, *et seq.*"[3]  But of the 60 DMCA subpoenas (the "DMCA Subpoenas") that Watchtower has requested (and largely obtained) since commencing a campaign to unmask its anonymous critics in 2017, not one has resulted in an actual claim of copyright infringement against any of the parties identified.[4]  The absolute absence of follow-through on any of the DMCA Subpoenas belies their stated purpose as tools of copyright enforcement.  Watchtower has sought the DMCA Subpoenas, including the Subpoena at issue here, for the purpose of doxing and punishing dissident JWs using a shunning practice known as "disfellowshipping."[5]

---

[1] *See* <u>Declaration of Malcolm Seymour in Support of Motion to Quash Subpoena and Proceed Anonymously</u> ("Seymour Decl."), ¶¶ 5-6.

[2] *See* <u>id.</u>, ¶ 4 & fn. 3.

[3] Doc. No. 1-2, p. 2, ¶ 4 (June 15, 2018 Declaration of Paul D. Polidoro).

[4] *See* <u>Seymour Decl.</u>, ¶¶ 32-37 & Exh. 9.  Indeed, the statute of limitations has run on at least three of these 60 claims. *See* <u>id.</u>, ¶ 37 & fn. 19.

[5] *See* <u>id.</u>, ¶¶ 22-26 (describing the JW practice of identifying and disfellowshipping "apostates").

The video that was the subject of the instant Subpoena (the "User Video") is a prototypical case of fair use under settled law of the Second Circuit.  The User Video excerpts small portions of a Watchtower religious broadcast (the "JW Video") for purposes of criticizing and lampooning the JW Video and JW doctrine more generally.[6]  The transformative creation of new works through sampling and criticism of existing works lies at the heart of the fair use doctrine.  The animating purpose of this doctrine is to encourage discourse around matters of social significance by reconciling the safeguards of copyright law with the freedoms of speech and expression secured by the First Amendment.  The User Video epitomizes the type of speech that fair use and the First Amendment exist to protect.

If the publications targeted by Watchtower's other DMCA Subpoenas offer commentary of a similarly satirical or critical nature, that might explain why Watchtower has not pursued them with claims of copyright infringement.  Such claims almost certainly would have failed.  But the vindication of copyright is not Watchtower's objective: Watchtower freely permits visitors to download and share the JW Video and other materials from its website, without any safeguards or even advisories against infringement.  And the remedies available under the Copyright Act are inconsequential to Watchtower: once the names of alleged infringers are known, Watchtower can visit more serious and lasting penalties than the statutory fines.  Disfellowshipping dissident JWs, makes an example out of Watchtower's critics in a way that civil penalties cannot do.

Tellingly, Watchtower has not attempted (or has attempted unsuccessfully) to take down the YouTube video (the "Cedars Video") that originally released the JW Video footage excerpted by the User Video.[7]  The Cedars Video reproduces the 53-minute JW Video nearly in its entirety,

---

[6] See id., ¶ 7 & Exh. 11 (access-restricted upload of the User Video for purposes of the Court's review).

[7] See id., ¶¶ 13-17 & fn. 12.

interspersed with critical analysis by another JW dissident.[8] And while the creator of the Cedars Video openly reveals his face and legal name on his YouTube channel,[9] upon information and belief Watchtower has never sued him for copyright infringement.[10]  It strains credibility for Watchtower to argue that it earnestly intends to bring copyright enforcement proceedings against the Movant when it has taken no legal action against the creator of the Cedars Video.

An unfortunate irony looms over the Watchtower's DMCA doxing campaign: the Jehovah's Witnesses, through Watchtower and its subsidiaries, have been responsible for several landmark First Amendment victories over the last century, including the Supreme Court's decision in *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002) ("Stratton").  Striking down an ordinance that would have required door-to-door canvassers to obtain permits and identify themselves in a public registry, the Court in *Stratton* upheld the right of JW missionaries to engage in anonymous proselytizing and political speech.  Watchtower has fought to defend the constitutional rights of JWs to anonymously advocate on behalf of their religion.  The same rights must also protect JWs who anonymously advocate against the religion.  The Watchtower's drive to unmask and root out dissidents within its own ranks does a disservice to the church's legacy as a defender of anonymous speech.  And it is a misuse of the DMCA's subpoena mechanism.

The fair use doctrine creates a safe harbor for transformative critical use of copyrighted works, recognizing the value of this criticism to free speech and social discourse.  If fair use and the First Amendment protect the Movant's right to voice these criticisms, they also protect his

---

[8] *See* id., ¶ 14 & fn. 10.

[9] *See* id., ¶ 17 & Exh. 6.

[10] *See* id.

right to voice them anonymously.  This is an additional reason to quash the subpoena: unmasking an anonymous speaker before there has been a finding of infringement (especially where, as here, there is overwhelming evidence of fair use) irreparably deprives him of the First Amendment right he is seeking to vindicate.

In the instant case, Movant's anonymity has serious real-world consequences.  Exposure of Movant's identity would likely lead to his disfellowshipping, resulting in the permanent loss of friend and family relationships.  Actively practicing JWs who do not live in Movant's home (including his parents and other relatives) would be required by religious rule to shun and avoid him.  In all likelihood, he would be unable to speak to his parents for the remainder of his or their lives. In light of the constitutional protections afforded to anonymous speech, the prospect of irreparable harm to Movant if his identity were revealed in these proceedings, and Watchtower's negligible likelihood of success on any future claim of infringement, the Court should grant Movant leave to appear anonymously in this and any subsequent proceedings, even if it permits Watchtower to obtain limited identifying information by the Subpoena.

Wherefore, and for the reasons set forth below, Movant respectfully requests that the Court quash the Subpoena or, in the alternative, grant Movant leave to proceed anonymously.

## STATEMENT OF FACTS

Movant publishes his videos under the pseudonymous YouTube account "kevin McFree" (the "Account").[11]  Most of Movant's videos are stop-frame Lego animations set in a fictitious village called "J-Dubtown," or simply "Dubtown."[12] They feature humorous voiceover that caricatures and criticizes JW practices.  On May 18, 2018, Movant posted a video to the Account

---

[11] *See* id., ¶ 6.

[12] *See* id., ¶¶ 11, 15, fn. 6 & Exh. 5 (depicting representative videos from Movant's Account).

titled "DUBTOWN – Family Worship July Broadcast" (the aforementioned User Video).[13]   The

User Video is a stop-frame Lego animation that depicts Dubtown characters viewing portions of a

video titled "JW Broadcasting – July 2018" (the aforementioned JW Video).[14]   The 13-minute

User Video excerpts roughly seven and a half minutes of footage from the 53-minute JW Video.[15]

Movant interjects, superimposes and overdubs parodic commentary over much of the excerpted

footage.[16]   Among other topics, the User Video criticizes JW depictions of violence against

women,[17] the removal of a man of African descent from JW iconography,[18] the religion's attitude

toward technology,[19] and the religion's attitude toward outside academic pursuits among its

adherents.[20]   On June 11, 2018, less than a month after its release, YouTube removed the User

Video at Watchtower's request.[21]   The Subpoena at issue in this proceeding was directed at

YouTube, requesting disclosure of Movant's name, email address, contact information, IP

addresses, and other identifying information.[22]

    Watchtower hosts the JW Video on its own website free of charge, with prominent links

welcoming viewers to download and distribute the file.[23]   While it may be freely downloaded and

---

[13] *See* id., ¶ 11 & Exh. 11.

[14] *See* id., ¶ 11 & Exh. 11; Exh. 12 (access-restricted upload of the JW Video for purposes of the Court's review).

[15] *See* id., ¶¶ 11, 12.

[16] *See* id., ¶ 11 & Exh. 11.

[17] *See* User Video, id., Exh. 11, at 4:05.

[18] *See* id. at 3:20.

[19] *See* id. at 6:10.

[20] *See* id. at 4:50.

[21] *See* Seymour Decl., ¶ 6.

[22] *See* Doc. No. 1-1 (proposed subpoena in substantially identical form to the Subpoena issued).

[23] *See* Seymour Decl., ¶ 14 & Exh. 3.

shared from the Watchtower website, the JW Video contains no copyright advisory warning against its reproduction or republication, or the creation of derivative works.[24]  Movant obtained JW Video footage from an April 4, 2018 posting (the aforementioned Cedars Video) on the "John Cedars" YouTube Channel.[25]  The Cedars Video reproduces most if not all of the 53-minute JW Video, punctuated by extended critical commentary.[26]  Though the Cedars Video reproduces a much greater portion of the JW Video, and has garnered far more views than any video uploaded to the Movant's Account,[27] the Cedars Video has not been removed from YouTube.[28] Significantly, while the creator of the Cedars Video personally appears in his videos and reveals his actual name in the introduction to his YouTube channel,[29] Watchtower has never – upon information and belief – commenced copyright infringement proceedings against him.[30]

In fact, based on a review of PACER Case Locator records, it appears that Watchtower has not commenced copyright infringement proceedings in connection with any of the 60 DMCA subpoenas (the "DMCA Subpoenas") it has requested (and usually obtained without opposition) from this and other District Courts since 2017.[31]  For several of these DMCA Subpoenas, Watchtower's time to commence enforcement proceedings has now expired.[32]  Watchtower's

---

[24] See id., fn. 7 & Exh. 12.

[25] See id., ¶ 13 & fn. 9.

[26] See id., ¶¶ 32-37 & Exh. 9.

[27] See id., ¶ 37 & fn. 19.

[28] See id., ¶ 16, Exh. 4 & fn. 12 (including linked video).

[29] See id., ¶ 17 & Exh. 6 (owner of John Cedars channel revealing his face and identity on his YouTube page).

[30] See id., Exh. 9 (PACER Case Locater report reflecting no lawsuits brought against Lloyd Evans, creator of the Cedars Video).

[31] See id., ¶¶ 32-37 & Exh. 9.

[32] See id., ¶ 37 & fn. 19 (collecting cases).

failure to pursue enforcement action against known infringers (including YouTube user John Cedars, or the individuals identified in response to other DMCA Subpoenas) casts doubt on Watchtower's representation that the Subpoena at issue here was sought for solely purposes of "protecting Watch Tower's rights under title 17 U.S.C. §§ 100, *et seq.*"[33]

Movant published the User Video pseudonymously because, though he is no longer a practicing JW, he has not been formally excommunicated (a process JWs call "disfellowshipping"), and may therefore maintain ties with family and friends in the religion.[34] The JW religion regards publication of views critical of the church as a form of apostasy, and the customary punishment for apostasy is disfellowshipping.[35] Actively practicing JWs are required to shun and avoid disfellowshipped ex-JWs, upon penalty of losing their own privileges or status within the church.[36] If Movant were disfellowshipped, he would be permanently shunned by his friends and even his family members (exceptions are granted only for family members living under the same roof).[37] Disfellowshipping would effectively sever Movant's ties with his parents, and with many of his closest friends.[38] Lapsed JWs who have been disfellowshipped describe the process as traumatic.[39] Movant's reasonable fear of disfellowshipping drives his desire to remain anonymous in these proceedings.

---

[33] Doc. No. 1-2, p. 2, ¶ 4 (June 15, 2018 Declaration of Paul D. Polidoro).

[34] *See* Seymour Decl., ¶¶ 24-25 & Exh. 8.

[35] *See* id., ¶ 23 & Exh. 7.

[36] *See* id., ¶ 24 & Exh. 8.

[37] *See* id., ¶¶ 24, 28 & Exh. 8.

[38] *See* id., ¶ 28.

[39] *See* id., ¶ 27 & Exh. 7.

## **ARGUMENT**

I.  The Subpoena Should be Quashed Because Watchtower Cannot State a Valid Claim of
Copyright Infringement

A motion to quash may be brought to limit or prevent a subpoena that would require disclosure of "privileged or other protected matter."  Fed. R. Civ. P. 45(d)(3)(A)(iii).  Where, as here, a subpoena requests identifying information for purposes of unmasking an anonymous speaker, it seeks matter potentially protected by the First Amendment.

> It is offensive – not only to the values protected by the First Amendment, but to the very notion of a free society – that in the context of everyday public discourse a citizen must first inform the government of her desire to speak . . . Three obvious examples illustrate the pernicious effect of such a permit requirement. First, as our cases involving distribution of unsigned handbills demonstrate, there are a significant number of persons who support causes anonymously.  "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, *by concern about social ostracism*, or merely by a desire to preserve as much of one's privacy as possible."

*Stratton*, *supra*, 536 U.S. at 165-66 (invalidating ordinance on First Amendment grounds, among other reasons, because it required JW canvassers to identify themselves by name in a village registry) (*quoting McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995)).  *See also*, *New York Times v. Sullivan*, 376 U.S. 254, 265 (1964) (court order in civil proceeding, compelling production of certain information, was "state action" subject to strictures of First Amendment); *Sony Music Entertainment Inc. v. Does 1-40*, 326 F.Supp.2d 556, 562-63 (S.D.N.Y. 2004) ("The Supreme Court has recognized that the First Amendment protects anonymous speech. . . . anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. . . . It is well-settled that the First Amendment's protection extends to the Internet. . . . The Internet is a particularly effective forum for the dissemination of anonymous speech") (internal quotations and citations omitted).

Watchtower has itself offered an impassioned defense of the importance of anonymous speech, in its opening brief in the *Stratton* case:

> The justification for including anonymous discourse within the liberty protected by the free speech and free press clauses predates the formation of this country. The press licensing law of England, the persecution of those engaged in the secret distribution of information, and the importance of anonymous discourse by pre-Revolutionary patriots moved this Court to recognize that "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind."

Br. for Pet'rs, 17, *Stratton*, No. 00-1737 (U.S. Nov. 29, 2001) (*quoting Talley v. California*, 362 U.S. 60, 64 (1960)).[40]

Accordingly, "[t]o the extent that anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010). And while, "anonymity . . . used to mask copyright infringement . . . is unprotected by the First Amendment" (*id.*), "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107. The factors relevant to determining whether quashal of a de-anonymizing subpoena is appropriate are:

> (1) [the] concrete[ness of the plaintiff's] showing of a prima facie claim of actionable harm, ... (2) [the] specificity of the discovery request, ... (3) the absence of alternative means to obtain the subpoenaed information, ... (4) [the] need for the subpoenaed information to advance the claim, ... and (5) the [objecting] party's expectation of privacy.

*Arista Records, LLC*, *supra*, 604 F.3d at 119 (*quoting Sony Music Entertainment Inc.*, *supra*, 326 F.Supp.2d at 564-65). A DMCA subpoena seeking identifying information of an alleged copyright infringer must therefore be quashed to preserve anonymity where the requesting party cannot make out a *prima facie* claim of copyright infringement.

---

[40] A copy of Watchtower's Petitioner's Brief in the *Stratton* case is annexed as Exhibit 10 to the <u>Seymour Aff.</u>

While fair use is nominally regarded as an affirmative defense, it has been distinguished from other affirmative defenses as an issue that may be appropriately determined on a Rule 12(b)(6) motion to dismiss, defeating an otherwise *prima facie* showing of infringement.  *See Hughes v. Benjamin*, 437 F.Supp.3d 382, 389 (S.D.N.Y. 2020) (defendant may defeat a *prima facie* showing of infringement by demonstrating fair use, and may do so on a motion to dismiss if the facts necessary to establish fair use are evident from materials "properly incorporated" by reference into the pleadings); *Harbus v. Manhattan Institute for Policy Research*, Case No. 19-CV-6124 (ER), 2020 WL 1990866 at *3 (S.D.N.Y. Apr. 27, 2020).  *See also Lenz v. Universal Music Group*, 815 F.3d 1145, 1152-53 (9th Cir. 2016) (because fair use is not infringement, "Even if . . . fair use is classified as an 'affirmative defense,' we hold—for the purposes of the DMCA—fair use is uniquely situated in copyright law so as to be treated differently than traditional affirmative defenses. We conclude that because 17 U.S.C. § 107 created a type of non-infringing use, fair use is 'authorized by the law' and a copyright holder must consider the existence of fair use before sending a takedown notification").  Where "the only two pieces of evidence needed to decide the question of fair use" are "the original version" and the allegedly infringing work, the issue of fair use may be resolved on a motion to dismiss.  *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013) (*quoting Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir.2012)).  *See also*, *Yang v. Mic Network, Inc.*, 405 F.Supp.3d 537, 542 (S.D.N.Y. 2019) (collecting cases holding that fair use can be determined by comparison of both works).[41]

Consistent with these principles, the Second Circuit and other courts have evaluated claims of fair use when adjudicating motions to quash DMCA identifying subpoenas.  *See, e.g. Arista*

---

[41] Movant has re-uploaded the User Video and the JW Video so that the Court's may review and compare the two works for purposes of deciding this Motion.  *See* <u>Seymour Decl.</u>, fns. 6, 7; Exhs. 11, 12.

*Records, supra*, 604 F.3d at 123-24; *In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d 875, 886-887 (N.D.Cal. 2020) (rejecting Watchtower's argument that fair use analysis was premature at motion to quash stage); *Art of Living Foundation v. Does 1-10*, Case No. 10-CV-5022 (LHK), 2011 WL 5444622, at *8, n. 6 (N.D.Cal. Nov. 9, 2011) ("As the fair use doctrine enshrines an important First Amendment protection, a court determining whether to unmask an anonymous defendant might consider fair use arguments raised in a motion to quash even where the applicable standard requires only a *prima facie* showing of the plaintiff's claim") (*citing Arista Records*, *supra*, 604 F.3d at 110).

### A.  The User Video Makes Fair Use of the JW Video and Is Not Infringement

The Copyright Act sets forth a non-exhaustive list of factors to be considered in determining whether a work that reproduces copyrighted material makes fair use of the original:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.  While Watchtower has made much of the fact that the User Video was published prior to the initial publication of the JW Video as evidence of Movant's "bad faith," courts

interpreting § 107 have stressed that a finding of bad faith "generally contributes little to fair use analysis . . . is not to be weighed very heavily . . . and cannot be made central to the fair use analysis." *NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 479, n. 3 (2d Cir. 2004) (*citing Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585, n. 18 (1994)).

       1.   *The User Video Makes Non-Commercial, Critical and Transformative Use of the JW Video*

The User Video is textbook example of transformative fair use under Second Circuit precedent, especially the closely analogous *NXIVM* decision, which warrants in-depth analysis. *NXIVM* concerned a claim of copyright infringement by a multi-level marketing organization in relation to a proprietary course manual that was "unpublished in the sense that it [was] not available to the general public." *NXIVM, supra*, 364 F.3d at 475.  The NXIVM manual was leaked by a NXIVM participant to defendant Rick Ross, an investigative journalist whose websites "provide[d] information to the public about controversial groups, about which complaints of mind control ha[d] been lodged."  *Id.*[42]  Ross provided a copy of the NXIVM manual to the two other defendants, each of whom drafted a report "analyz[ing] and critiqu[ing] the materials for the manual, . . . quot[ing] sections of the manual in support of their analyses and criticisms."  *Id.*

While acknowledging that the journalists' unauthorized use of the unpublished NXIVM manual "weigh[ed] in favor of plaintiffs," the Second Circuit ultimately concluded that the "critical and transformative" nature of the defendants' use minimized the importance of the manual's "bad faith" acquisition.  *Id.* at 478-489.  The *NXIVM* court distinguished the holding in *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985), finding that the misappropriation and

---

[42] Last year, following a high-profile jury trial, NXIVM founder Keith Raniere was convicted on counts of racketeering, forced labor, wire fraud and sex trafficking.  *See U.S. v. Raniere*, Case No. 18-CR-204 (S-2) (NGG), Doc. No. 735 (E.D.N.Y. June 20, 2019).  Ross' early reporting on the organization was instrumental in bringing concerns about the group's indoctrination practices to public attention.

publication of a "purloined manuscript" in that case was done with "the intended purpose of supplanting the copyright holder's commercially valuable right of first publication." *NXIVM*, *supra*, 364 F.3d at 478-79.  While NXIVM argued "that its first publication rights were similarly 'scoop[ed],'" the Second Circuit disagreed, holding that the purpose of transformative criticism, by definition, was not to supplant or replace the original.  *Id.* at 479.

Just as in *NXIVM*, the first factor of the fair use inquiry favors the Movant.  Both the User Video and the JW Video are non-commercial in nature.  The User Video was available for free on the Movant's YouTube Account,[43] and the JW Video may be viewed, downloaded and shared free of charge from the JW website.[44]  Movant never monetized the User Video.[45]  The purpose of the User Video is to educate viewers about what Movant considers to be the shortcomings of the JW religion, through satire and direct criticism.[46]  The User Video so heavily edits and alters the original JW Video that it could not conceivably supplant or "scoop" the original – it is a fair and transformative use.

### 2. *The JW Video is Informational and Non-Commercial in Nature*

The second element of the fair use inquiry examines "the nature of the copyrighted work" by considering "the protection of the reasonable expectations of one who engages in the kinds of creation/authorship that the copyright seeks to encourage."  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006).  Generally speaking, creative or expressive works and commercial works are afforded greater copyright protection. *See Blanch v. Koons*, 467

---

[43] *See* Seymour Decl., ¶ 11 & fn. 8.

[44] *See* id., ¶ 18 & Exh. 3.

[45] *See* id., ¶ 11 & fn. 8.

[46] *See* id., ¶¶ 11, 22.

F.3d 244, 256 (2d Cir. 2006) (artistic and expressive works receive greater protection) (*quoting* Howard B. Abrams, The Law of Copyright, § 15:52 (2006)); *Yang*, *supra*, 405 F.Supp.3d at 545. The JW Video is religious, educational and informational in nature, which weighs slightly in favor of a finding of fair use – but it was also unpublished at the time of its use by Movant, which weighs slightly against a finding of fair use.  *See id.*

However the Court may balance these opposing factors, the second prong of the fair use test is ultimately "of limited usefulness where the creative work of art is being used for a transformative purpose."  *Bill Graham Archives*, *supra*, 448 F.3d at 613.  This Court's decisions have minimized this element of the fair use test as "rarely determinative," and "of little import." *See Hughes*, *supra*, 437 F.Supp.3d at 393; *Harbus*, *supra*, 2020 WL 1990866 at *6.

### 3.  *The User Video Excerpts an Insubstantial Portion of the JW Video*

The "amount and substantiality" factor of the fair use test weighs in Movant's favor.  This factor looks to the percentage of the original work used in the new work, and not the percentage of the new work consisting of the original work.  *NXIVM*, *supra*, 364 F.3d at 480 (*quoting* 17 U.S.C. § 103(3)).  While there is no bright-line standard for substantiality, "[t]he crux of the inquiry is whether 'no more [content] was taken than necessary,' given the purpose and character of the allegedly infringing use." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014). Generally speaking, the more transformative the use, the greater the permissible amount.  *See Campbell*, *supra*, 510 U.S. at 578 ("the more transformative the new work, the less will be the significance of other factors . . . that may weigh against a finding of fair use"); *Bill Graham Archives*, *supra*, 448 F.3d at 613 (copying of entire image may still be fair use depending on context); *Hughes*, *supra*, 437 F.Supp.3d at 392 (noting that "courts have found transformative uses even in cases involving exact copying").

Courts have found fair use where a new work used even more substantial portions of the original work than the User Video did of the JW Video.  The User Video excerpts roughly 14% of the JW Video, which is not a substantial amount in light of its parodic intent and transformative use.  *See Hughes*, *supra*, 437 F.Supp.3d at 393 (new video that copied 20 percent of original video for purposes of criticizing original was fair use); *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34, 46 (S.D.N.Y. 2017) (where intent of new work was to critique and parody original, new work's use of three minutes and fifteen seconds of video footage from five minute and twenty-four second original was fair).  The User Video superimposes music, speech and text over much of the borrowed JW Video footage.  *See Blanch*, *supra*, 467 F. 3d at 248, 257-58 (doctoring of original photograph decreased substantiality of use); *Harbus*, *supra*, 2020 WL 1990866 at *7 (heavy cropping and doctoring of photograph decreased substantiality of use); *Yang*, *supra*, 405 F.Supp.3d at 546-47 (cropping of photograph weighed in favor of defendant on fair use inquiry).  And the User Video does not excerpt footage from the JW Video except to parody and criticize it.  *See NXIVM*, *supra*, 364 F.3d at 481 (portion of original worked used was not excessive because all excerpted portions were relevant to defendants' analysis and critical commentary); *Hosseinzadeh*, *supra*, 276 F. Supp.3d at 46 (even where new video used 60 percent of footage from original, "a great deal of plaintiff's work was copied, but such copying was plainly necessary to the commentary and critique").  Applying the guidelines set forth by these cases, the third factor of the fair use case clearly favors the Movant.

4.  *The User Video Is Not a Replacement for the JW Video and Does Not Impact the Non-Commercial "Market" for the JW Video*

The fourth and final prong of the fair use test, concerning "the effect of the secondary use upon the potential market for the value of the copyrighted work," roundly favors the Movant.  *Cariou*, *supra*, 714 F.3d at 708.

> [T]he application of this factor does not focus principally on the question of damage
> to [the copyright owner's] derivative market. We have made clear that 'our concern
> is not whether the secondary use suppresses or even destroys the market for the
> original work or its potential derivatives, but whether the secondary use usurps the
> market of the original work.' . . . Our court has concluded that an accused infringer
> has usurped the market for copyrighted works, including the derivative market,
> where the infringer's target audience and the nature of the infringing content is the
> same as the original. . . . Conducting this analysis, we are mindful that "[t]he more
> transformative the secondary use, the less likelihood that the secondary use
> substitutes for the original," even though "the fair use, being transformative, might
> well harm, or even destroy, the market for the original."

*Id.* at 708-09 (*quoting Blanch*, *supra*, 467 F.3d at 258; *NXIVM*, *supra*, 364 F.3d at 481-82; *Castle Rock Entertainment v. Carol Publishing Group, Inc.*, 150 F.3d 132, 145 (2d Cir. 1998)) (internal citations omitted). "[A] lethal parody, like a scathing theater review, kills demand for the original, [but] does not produce a harm cognizable under the Copyright Act." *Campbell*, *supra*, 510 U.S. at 591-92.

Because the JW Video is not commercial in nature, it has no "market" to speak of. But even if the term "market" is interpreted liberally to mean "audience," the User Video so heavily alters, edits and satirizes the JW Video that it could not plausibly serve as a substitute for the original. The purpose served by the User Video is opposite that of the JW Video – the former promotes skepticism, while the latter promotes piety and worship. The two videos are not directed at the same audience, and while the User Video aims to reduce demand for the JW Video, it is by its nature incapable of usurping that demand.

Because three of the four statutory factors support a finding of fair use, two of them decisively so, Movant overcomes any *prima facie* showing of copyright infringement by Watchtower, warranting quashal of the Subpoena. *See Arista Records, supra*, 604 F.3d at 123-24 (court should evaluate claims of fair use in determining motion to quash DMCA identifying subpoena).

## II.  The Subpoena Should Be Quashed Because Watchtower Has Misrepresented its Purpose

The availability of the DMCA subpoena mechanism is restricted to parties who seek information to enforce rights conferred by the Copyright Act.  As such, a party requesting a DMCA subpoena must certify, as Watchtower has done in this case,[47] that "the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title."  17 U.S.C. § 512(h).  The Court permitted issuance of the Subpoena at issue here in reliance on Watchtower's representation that it would only use Movant's name and identifying information for purposes of enforcing its copyright in the JW Video.

Three years have now passed since Watchtower started requesting DMCA subpoenas *en masse* to unmask dissidents, and in that time a factual record has developed that belies the representations made in Watchtower's statutory declaration. Of the 60 DMCA Subpoenas Watchtower has requested, not one has culminated in a claim of copyright infringement.[48]  Perhaps more tellingly, Watchtower has not – upon information and belief – brought any infringement claim against the creator of the Cedars Video, even though Watchtower knows his name,[49] and his video reproduces the JW Video almost in full.[50]  These facts had not come to light in 2018, when the Court permitted issuance of the Subpoena.  But they are apparent now from a search of publicly available records.

---

[47] Doc. No. 1-2, p. 2, ¶ 4.

[48] *See* Seymour Decl., ¶¶ 32-37 & Exh. 9.

[49] *See* id., ¶ 17 & Exh. 9 (showing no copyright lawsuit by Watchtower against Lloyd Evans, creator of the Cedars Video).

[50] *See* id., ¶ 16 & fn. 12.

Watchtower should not be able to misuse the DMCA subpoena mechanism for the purpose of doxing and ostracizing its critics.  The Court should not permit enforcement of the Subpoena absent an enhanced showing by Watchtower that (1) this is the true purpose for which the DMCA Subpoenas have been requested and (2) identifying information acquired by way of the DMCA Subpoenas has not been used for purposes of disfellowshipping alleged copyright infringers, whether by Watchtower or any other affiliated entity.[51]

III. If the Subpoena Is Not Quashed, Movant Should Be Permitted to Appear Anonymously in Future Proceedings

Even if the Court does not wish to pass on the merits of Watchtower's underlying copyright claim, and allows the Subpoena to go forward, it should protect Movant's anonymity unless and until a claim of infringement has been proven.  *See, e.g.*, *Malibu Media LLC v. Doe No. 4*, Case No. 12-CV-2950 (JPO), 104 U.S.P.Q. 1941, 2012 WL 5987854, at *4-5 (S.D.N.Y. Nov. 30, 2012) (granting leave to proceed anonymously even while permitting DMCA subpoena to issue).  While Fed. R. Civ. P. 10(a) ordinarily requires that parties to a lawsuit be identified by name in the caption, the Second Circuit has outlined a balancing test to be applied where a litigant seeks an exception to this rule and leave to proceed anonymously:

> (1) whether the litigation involves matters that are highly sensitive and of a personal nature; (2) *whether identification poses a risk of retaliatory physical or mental harm to the ... party [seeking to proceed anonymously] or even more critically, to innocent non-parties*; (3) *whether identification presents other harms and the likely severity of those harms, including whether the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity*, (4) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, *whether the nature of that prejudice (if any) differs at any particular stage of the*

---

[51] Alternatively, if the Court permits the Subpoena to go forward, it should enter an injunction directing Watchtower and its affiliates to use such information only for the purpose of pursuing copyright claims against the Movant.  *See, e.g.*, *Signature Management Team, LLC v. Automattic, Inc.*, 941 F.Supp.2d 1145, 1157, 1158-59 (N.D. Cal. 2013) (permitting issuance of DMCA subpoena, but prohibiting issuer from "disseminat[ing] [movant's] identity or tak[ing] any retaliatory action," and ordering that "information disclosed . . . in response to the subpoena may be used . . . solely for the purpose of protecting its rights under the Copyright Act . . . and may not be disclosed to anyone other than the parties in this action and their counsel of record without further order of this Court").

> *litigation, and whether any prejudice can be mitigated by the district court*; (5) whether the plaintiff's identity has thus far been kept confidential; and (6) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity.

*Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008) (internal quotations and citations omitted) (emphasis added).00

Relevant to the first three factors of the foregoing test, the accompanying Declaration details how Movant's identification in these proceedings would subject him to foreseeable mental harm in the form of his disfellowshipping.[52]  Movant would be cut off from any friend of his who remains a practicing JW, and from any relatives who do not live in his home, including his parents.[53]  This Court has held that mental harm of comparable severity warrants permission to proceed anonymously.  *See Doe v. Bedford Central School District, et al.*, Case No. 18-CV-11797 (VB), 2019 WL 493819, at *1 (S.D.N.Y. Feb. 8, 2019) (parents of adolescent who committed suicide were permitted to remain anonymous, so that their other children would not be harassed at school); *Malibu Media, LLC*, *supra*, 2012 WL 5987854, at *4 (individual accused of downloading pirated pornographic films permitted to remain anonymous to avoid reputational harm).  Movant has opposed both the Subpoena and the underlying copyright claim not because he seeks to republish the User Video, but because he wishes to enforce his First Amendment right to anonymity.  Permitting Movant to proceed anonymously would avoid the scenario in which the "injury litigated against" is incurred by virtue of the litigation itself.  *Sealed Plaintiff*, *supra*, 537 F.3d at 190.  Movant has maintained complete anonymity in these proceedings thus far;

---

[52] *See* Seymour Decl., ¶¶ 22-28.

[53] *See* id. ¶ 28.

accordingly, the first, second, third and fifth factors of the *Sealed Plaintiff* test all counsel in favor of granting leave to proceed anonymously.

Concerning the fourth factor of this test, Watchtower argues that it would be prejudiced by Movant's continued anonymity in these proceedings because "Watch Tower cannot send a cease and desist letter or issue service of process absent the individual's name."[54]  The Second Circuit has stressed that the weight afforded to this factor should be guided by "whether any prejudice can be mitigated by the district court."  *Id*.  If the Court concludes that Watchtower has a colorable claim of copyright infringement, it could fashion any number of equitable solutions that would preserve Movant's anonymity while negating any prejudice to Watchtower, including: granting Watchtower leave to serve process and/or any cease and desist letter on Movant through Movant's undersigned counsel;[55] permitting the Subpoena to go forward only to the extent of seeking Movant's IP address; and/or limiting disclosure of Movant's name and identifying information to outside counsel who have appeared on Watchtower's behalf in these proceedings, with such information to be handled on an attorneys' eyes only basis.  Because any prejudice to Watchtower could be avoided, this factor does not support denial of leave to proceed anonymously.

While the public may have a strong interest in the openness and transparency of judicial proceedings, this does not necessarily equate to a strong interest in disclosure of a civil litigant's personal identifying information.  *See, e.g.*, *Doe*, *supra*, 2019 WL 493819, at *1 (where lawsuit disclosed identities of relevant public officials and fully described incidents giving rise to litigation, "the public's interest in the litigation would not be furthered by also requiring [litigants'] identities to be disclosed," and "the public's interest in being informed about the subject matter of

---

[54] Doc. No. 7, p. 2.

[55] Movant has conditionally authorized his undersigned counsel to accept service of a cease and desist letter (1) if his Motion to quash is denied and (2) if his Motion for leave to proceed anonymously is granted.

the case has been met"); *Malibu Media, LLC*, *supra*, 2012 WL 5987854, at *5 (while public scrutiny of judicial proceedings is vital, public's interest in knowing the names of copyright defendants is of less importance).  Because Movant does not aim to seal these proceedings but merely maintain the secrecy of his identity, the public's interest in judicial transparency is only minimally implicated by his request to proceed anonymously.

With four of six factors favoring Movant's continued anonymity, one factor presenting as neutral, and any potential prejudice to Watchtower capable of neutralization, Movant should be granted leave to proceed anonymously, even if the Court denies quashal.

## <u>CONCLUSION</u>

Wherefore, for the reasons set forth above, Movant respectfully requests that Watchtower's Subpoena be quashed or, in the alternative, that Movant be allowed to remain anonymous in this and any subsequent proceedings, and such other, further and different relief as the Court deems just and proper.

Dated: New York, New York
      September 28, 2020

FOSTER GARVEY P.C.

By: /s/ Malcolm Seymour
    Malcolm Seymour (MS-3107)
    100 Wall Street, 20th Floor
    New York, New York 10005-3708
    (212) 965-4533
    malcolm.seymour@foster.com

*Attorneys for Movant John Doe*